UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

*****************************************************************

UNITED STATES OF AMERICA

                                    Docket No. 00-CR-253
v.                                  New Orleans, Louisiana
                                    Wednesday, December 12, 2007

TIMOTHY TAPP

*****************************************************************


TRANSCRIPT OF EVIDENTIARY HEARING PROCEEDINGS
HEARD BEFORE THE HONORABLE KURT D. ENGELHARDT
UNITED STATES DISTRICT JUDGE



APPEARANCES:

FOR THE GOVERNMENT:              UNITED STATES ATTORNEY'S OFFICE
                                 BY:  MAURICE LANDRIEU, ESQ.
                                 500 Poydras Street, Room HB-210
                                 New Orleans, LA 70130


FOR THE DEFENDANT:               FEDERAL PUBLIC DEFENDER'S OFFICE
                                 BY:  ROBIN SCHULBURG, ESQ.
                                 500 Poydras Street, Room HB-318
                                 New Orleans, LA 70130


Official Court Reporter:         Karen A. Ibos, CCR, RPR, CRR
                                 500 Poydras Street, Room HB-406
                                 New Orleans, Louisiana 70130
                                 (504) 589-7776



     Proceedings recorded by mechanical stenography, transcript
produced by computer.

1                          I N D E X

2

3    WITNESSES FOR THE DEFENDANT:                    PAGE/LINE:

4    TIMOTHY TAPP

5       Direct Examination by Ms. Schulburg           5/12

6       Cross-Examination by Mr. Landrieu             7/10

7       Redirect Examination by Ms. Schulburg        14/15

8

9

10   KENYATTA TAPP

11      Direct Examination by Ms. Schulburg          16/2

12      Cross-Examination by Mr. Landrieu            17/25

13

14

15   WILBERT TAPP

16      Direct Examination by Ms. Schulburg          22/5

17      Cross-Examination by Mr. Landrieu            22/24

18      Redirect Examination by Ms. Schulburg        26/24

19

20

21

22

23

24

25

1            P R O C E E D I N G S

2            (WEDNESDAY, DECEMBER 12, 2007)

3                (EVIDENTIARY HEARING)

4

5

6            THE COURT:  Criminal Action 00-253, United States v.

7   Timothy Tapp.

8            MS. SCHULBURG:  Robin Schulburg, Federal Public Defender's

9   Office on behalf of Mr. Tapp who is present.

10           THE COURT:  Good morning.

11           MR. LANDRIEU:  Good morning, your Honor, Maurice Landrieu

12   on behalf of the United States.

13           THE COURT:  We have two matters on the docket today.

14   Mr. White, you are here for sentencing.  Your matter was set for

15   9:30.  So if you would bear with us, we are going to go ahead and

16   take up this matter and by that time we'll be ready to take up your

17   case.

18            We also have witnesses.

19           MS. SCHULBURG:  Yes, your Honor.

20           THE COURT:  This is a hearing on Mr. Tapp's 2255

21   application, and the Fifth Circuit took up Mr. Tapp's issue and

22   remanded the matter for an evidentiary hearing to determine if

23   Mr. Tapp is able to demonstrate by a preponderance of the evidence

24   that he requested an appeal.  The court instructed this court to

25   have an evidentiary hearing which we are going to do today.  The

1  result of which, if successful, will be an out of time appeal of

2  Mr. Tapp's case.

3          All right.  Now we have witnesses, I understand, Mr. Tapp,

4  a Kenyatta Tapp and Wilbert Tapp will be testifying.

5          MS. SCHULBURG:  That's correct, your Honor.

6          THE COURT:  And then, Mr. Landrieu, from your side you had

7  indicated that perhaps Mr. Spears.

8          MR. LANDRIEU:  That's correct.  We may call witnesses, we

9  may not, depending on what is presented by defense, your Honor.

10         THE COURT:  Let's go ahead and take that up.  We will

11  sequester the witnesses.  So at this time Ms. Kenyatta Tapp and

12  Mr. Wilbert Tapp, are you all here in the courtroom?  Am I correct

13  that that's who you all are?

14         THE WITNESSES:  Yes.

15         THE COURT:  Thank you.  If you would step outside, don't

16  go too far away from that area right outside of the door, we will

17  call you when needed.  It shouldn't take very long, we will call you

18  when needed, you can come in and answer the attorney's questions and

19  then you can remain in the courtroom after that.

20         All right.  Is there any need for anyone to make any

21  opening comments at this time?

22         MS. SCHULBURG:  No, your Honor.  Perhaps at the end after

23  the witnesses have presented I'd like to say a few words.

24         THE COURT:  Okay.  And the court will certainly allow you

25  to do that.  Why don't we go ahead and proceed.  Ms. Schulburg, go

1    ahead and call your first witness.

2            MS. SCHULBURG:  We call Mr. Timothy Tapp.

3            THE COURT:  Mr. Tapp, if you would come up here, please,

4    sir.  Remain standing until you take the oath.

5            THE DEPUTY CLERK:  Please raise your right hand.

6        (WHEREUPON, TIMOTHY TAPP, WAS SWORN IN AND TESTIFIED AS

7    FOLLOWS:)

8            THE DEPUTY CLERK:  Thank you.  You may be seated.  And

9    please state your name for the record.

10            THE WITNESS:  Timothy Tapp.

11                        DIRECT EXAMINATION

12    BY MS. SCHULBURG:

13    Q.  Mr. Tapp, you are the person who filed a 2255 motion asking for

14    an appeal; is that correct?

15    A.  Yes, ma'am.

16    Q.  Let's go back to the day that you were sentenced, June 20th,

17    2001.  Who represented you at the sentencing hearing?

18    A.  Mr. Ron Austin.

19    Q.  And for whom did Mr. Austin work?

20    A.  Ike Spears.

21    Q.  Who did you actually retain as your lawyer, Mr. Spears or

22    Mr. Austin?

23    A.  Yes, Mr. Spears.

24    Q.  What was your sentence?

25    A.  194 months.

1    Q.   After the sentence did you ask Mr. Austin to appeal?

2    A.   Yes, I did.

3    Q.   When did this occur?

4    A.   Right after the sentencing hearing.

5    Q.   And what did you say to him?

6    A.   I let him know I was unhappy with my sentence I received, and I

7    told him if I knew matters were going to turn out the way it did I

8    would have went to trial because I was unhappy with the sentence I

9    received, I was mislead.

10   Q.   Anything more about appeals?

11   A.   Yes, I told him I wanted to appeal.

12   Q.   Did you ever discuss appealing with Ike Spears?

13   A.   Yes, I did.

14   Q.   And when was that?

15   A.   Three or four days after the hearing, a week, a week -- less

16   than a week to be sure.

17   Q.   Less than a week to be sure?

18   A.   Yes, positive, less than a week.

19   Q.   And was that conversation in person or on the telephone?

20   A.   On the telephone through three-way call from my wife.

21   Q.   Would you tell the court about what happened during that

22   conversation?

23   A.   I told Mr. Spears I was unhappy with my sentence and that I

24   wanted to appeal.

25   Q.   Did he say anything in response?

```
 1   A.  Yeah, he said he had talked to Mr. Austin who was at the

 2   sentencing hearing and that they was going to do the appeal.

 3   Everything would get took care of.

 4        MS. SCHULBURG:  I have nothing further.  I think

 5   Mr. Landrieu might have some questions.

 6        THE COURT:  All right.

 7        MS. SCHULBURG:  Subject to redirect.

 8        THE COURT:  Sure.

 9                    CROSS-EXAMINATION

10   BY MR. LANDRIEU:

11   Q.  Mr. Tapp, my name is Maurice Landrieu.  I was the prosecutor in

12   connection with your case; is that correct?

13   A.  Right.

14   Q.  You said that you asked Mr. Austin, you told Mr. Austin you were

15   not happy with your sentence.

16   A.  Yes, sir.

17   Q.  You told him that the day of the sentencing?

18   A.  Right.

19   Q.  Is there a reason then, sir, if you were not happy with the

20   sentence that you received and you wanted to appeal, why you didn't

21   tell the court that when you were standing right in front of I

22   believe it was Judge Clement who was sentencing you, why didn't you

23   tell the judge, Judge, I'm not happy with the plea agreement I've

24   entered into, I'm not happy with Mr. Austin representing me, I would

25   like to appeal my sentence?
```

1    A.  I did want to speak but Mr. Austin told me to be quiet.

2    Q.  Oh, really.  This is a copy of the transcript of the sentencing

3    hearing.

4    A.  Right.

5    Q.  Can you flip through that, sir, and see --

6          MS. SCHULBURG:  Can I see a copy, your Honor?

7          THE COURT:  Yes.  Go ahead and show it to Ms. Schulburg.

8    Also I don't have a copy but I'll look at it when the witness is

9    finished.

10          MR. LANDRIEU:  I may have an extra copy, Judge.  It is

11   part of the court record, your Honor.

12          THE COURT:  I understand that.  I just don't have a copy

13   here physically in front of me.

14          MR. LANDRIEU:  I walked out of my office this morning and

15   left the other copies.

16          THE COURT:  Let's just work through it.  Ms. Schulburg has

17   now had a chance to look at it, let's let Mr. Tapp look at it, and

18   we'll go from there.

19   BY MR. LANDRIEU:

20   Q.  Is there any place in that transcript, sir, of the hearing when

21   you were sentenced where you told the court when you had an

22   opportunity to speak to the court where you said, your Honor, with

23   all due respect, I'd like to go ahead and appeal my sentence?

24   A.  No, I didn't.

25   Q.  You did not?

1    A.  Right.

2    Q.  You did have an opportunity to speak to the court though, didn't

3    you?

4    A.  Yeah.

5    Q.  But you decided not to talk to the court about that?

6    A.  My attorney told me he was going to do the appeal, to just be

7    quiet.

8    Q.  Did you ask your attorney -- you just said you asked your

9    attorney -- I mean your attorney told you be quiet, don't talk about

10   that?

11   A.  Right.

12   Q.  So you asked your attorney even before you were sentenced that

13   you wanted to appeal?

14   A.  No, sir.

15   Q.  How did that conversation take place then?

16   A.  That was after the sentencing hearing when we spoke about the

17   appeal, sir.

18   Q.  Did you at any point in time after the sentencing --

19   A.  Excuse me?

20   Q.  If at any point in time after the sentencing did you write a

21   letter that you can show us today asking Mr. Spears or Mr. Austin

22   that you, in fact, wanted to appeal, do you have a copy of any

23   documents that you sent them requesting that?

24   A.  A letter after the sentencing?

25   Q.  Uh-huh.

1    A.   Yeah.   When my sentence got, when my appeal got sent back from

2    the Fifth Circuit I asked, I had sent Mr. Ike Spears a letter.

3    Q.   But that was well after the sentencing?

4    A.   Right.

5    Q.   You had ten days within which to file your notice of appeal.

6    A.   Yeah, I was trying --

7    Q.   Within those ten days, do you have any document that you wrote

8    indicating to Mr. Spears or to Mr. Austin that you wanted to file an

9    appeal in connection with your case?

10   A.   No, I don't.

11   Q.   You remember the plea agreement that you signed, correct?

12   A.   Yes, sir.

13   Q.   You remember that it had waiver language in there waiving your

14   right to appeal and to file a 2255 motion, correct?

15   A.   It did have exceptions in it though, Mr. Landrieu, it had

16   exceptions.

17   Q.   And what were those exceptions?

18   A.   If the sentence go out, over the statutory or if it go upward

19   departure.

20   Q.   And you didn't get an upward departure or over the statutory, am

21   I correct?

22   A.   Well, my sentence I felt like I did.

23   Q.   You felt like you did.   Why did you feel like you did?

24        MS. SCHULBURG:   Objection, your Honor.   This has been

25   covered by the Fifth Circuit.   The presence of an appeal waiver is

1    irrelevant to whether the client gets an appeal.  All he has to show

2    is he asked.

3                MR. LANDRIEU:  It just goes to his credibility.

4                THE COURT:  I am going to overrule.  I am going to let him

5    answer.

6    BY MR. LANDRIEU:

7    Q.  So you didn't get over the statutory limit, correct?

8    A.  No, sir.

9    Q.  Because the statutory limit was life imprisonment, correct, ten

10   to life?

11   A.  Right.

12   Q.  And the court had calculated your guidelines to be I think it

13   was a level 38?

14   A.  Right.

15   Q.  A couple of points in there, I forget exactly what criminal

16   history you were, and you wound up getting 196 months?

17   A.  194 months.

18   Q.  194 months, which was within your guidelines that were

19   calculated by the probation office, correct?

20   A.  Me and my attorney talked about it, he told me I was going to

21   start off on a level 36.  Y'all must have some miscommunication

22   somewhere because my attorney said you and him had spoke and that I

23   was going to start off on level 36.  But when I got my PSI back, my

24   presentence investigation report back it was totally different.

25   That's why we did the objections.

```
 1   Q.  Okay.  And you understand that that factual basis that you

 2   signed stipulated to the amount of drugs that you were being held

 3   accountable for, correct?

 4   A.  Yes.  I was mislead because Mr. Spears wasn't present at the

 5   time.  Ms. Michelle Goodledge (PHONETIC), she was just somebody that

 6   was standing in for Mr. Spears.

 7   Q.  But you signed the factual basis, correct?

 8   A.  Yeah.  I was mislead to sign it, coerced to sign it.

 9   Q.  You stood before the federal court --

10          MS. SCHULBURG:  Your Honor, I have to object again.  This

11   has gone on and on and has nothing to do with whether he asked for

12   an appeal.

13          MR. LANDRIEU:  It goes to his credibility.

14          THE COURT:  It does have to do with credibility and it

15   does have to do with this witness's ability to understand and

16   communicate and take actions with or without or against the advice

17   of counsel, which I think is the issue here.  So it's a little bit

18   broader than simply asking him a single question.  Again, I don't

19   want to spend too much time on the merits of the underlying crime or

20   on the merits of any possible appeal.  So I'll give you a little

21   latitude, but let's move on.

22          MR. LANDRIEU:  We'll go through it pretty quickly.

23          THE COURT:  Go ahead.

24   BY MR. LANDRIEU:

25   Q.  You did, in fact, sign a factual basis, correct?
```

1    A.  Yes, I did.

2    Q.  That factual basis did specifically spell out the amount of

3    drugs that you were being held accountable for, correct?

4    A.  Yeah, but I had -- yes.

5    Q.  You also came before the federal judge and you swore under oath

6    that the facts in that factual basis were true and correct?

7    A.  Right.

8    Q.  Correct?

9    A.  Right.

10   Q.  At no time after you pled guilty up until the time that you were

11   sentenced did you write the court a letter saying I want to withdraw

12   my plea, did you?

13   A.  No.  Because I'm under the influence that I was going to get the

14   time that I thought I was going to get what my lawyer told me

15   because I had a paid lawyer.

16   Q.  You also mentioned one other fact on direct examination that if

17   you knew you were going to get 194 months that you would have just

18   not entered a plea and you would have gone to trial?

19   A.  Yes, sir.

20   Q.  You also understand that if you would have gone to trial you

21   would have been multiple billed under 851 and you could have

22   received a sentence of 240 months if you would have been convicted?

23           MS. SCHULBURG:  Objection, your Honor, I don't know if

24   that's accurate.

25           MR. LANDRIEU:  His plea agreement indicates that 851

1    wasn't filed.

2          THE COURT:  If he doesn't understand that to be the case

3    he can say so, but let's try to move on.

4    BY MR. LANDRIEU:

5    Q.  Do you understand that to be the case?

6    A.  No, I don't.

7    Q.  One last question.  You don't have any documentation between the

8    time that you were sentenced until the time, until ten days after

9    your sentence indicated that you wanted to file an appeal, am I

10   correct?

11   A.  No.

12         MR. LANDRIEU:  The government has nothing further.

13         THE COURT:  Redirect.

14                      REDIRECT EXAMINATION

15   BY MS. SCHULBURG:

16   Q.  Mr. Tapp, did your appeal waiver include the right to appeal

17   your conviction to the best of your knowledge?

18   A.  Excuse me?

19   Q.  Do you recall, did it include a waiver of your right to appeal

20   your conviction to the best of your knowledge?

21   A.  Did I understand it?

22   Q.  Yeah.  Did you understand your appeal waiver to include the

23   right to appeal your conviction or was it just your sentence?

24   A.  My sentence.

25   Q.  What about the conviction and ineffective assistance of counsel

1    with respect to your guilty plea itself?

2    A.   Right.

3    Q.   Was that within the appeal waiver?

4    A.   Right.

5    Q.   Your prior convictions, Mr. Tapp, do you have any prior felony

6    convictions?

7    A.   No, ma'am.

8    Q.   All misdemeanors, correct?

9    A.   Just misdemeanors.

10            MS. SCHULBURG:   Thank you, nothing further.

11            THE COURT:   Thank you, Mr. Tapp.   You can step down,

12   please.

13             All right.   Who is next?

14            MS. SCHULBURG:   Kenyatta Tapp.

15            THE COURT:   Kenyatta Tapp.   Would you please summon

16   Kenyatta Tapp to come in, please.

17             Ma'am, if you would come up here, please.   Remain standing

18   until you take the oath.

19            THE DEPUTY CLERK:   Please raise your right hand.

20      (WHEREUPON, KENYATTA TAPP, WAS SWORN IN AND TESTIFIED AS

21   FOLLOWS:)

22            THE DEPUTY CLERK:   Thank you.   You may be seated.   Please

23   state and spell your full name for the record.

24            THE WITNESS:   Kenyatta Tapp, K-E-N-Y-A-T-T-A, Tapp,

25   T-A-P-P.

```
 1                      DIRECT EXAMINATION

 2   BY MS. SCHULBURG:

 3   Q.  Ms. Tapp, you are Timothy Tapp's wife, wife of the defendant?

 4   A.  Yes.

 5   Q.  How long have you been married?

 6   A.  Seven years.

 7   Q.  Do you have children?

 8   A.  Yes, three kids.

 9   Q.  I understand you moved to Houston after Hurricane Katrina; is

10   that correct?

11   A.  Yes, ma'am.

12   Q.  Do you work?

13   A.  Yes.

14   Q.  Where?

15   A.  Home Depot.

16   Q.  And for how long have you worked there?

17   A.  Ten months.

18   Q.  Let's go back to Mr. Tapp's sentencing in June of 2001.  Were

19   you there?

20   A.  Yes, I was.

21   Q.  And did you speak to your husband's lawyer after sentencing?

22   A.  Yes.

23   Q.  Who was that?

24   A.  Ron Austin.

25   Q.  And where did you have that conversation?
```

1    A.  When we were leaving out of the courtroom after the sentencing.

2    Q.  Could you tell us about that conversation?

3    A.  After Timothy was sentenced, he was sentenced to 194 months and

4    I really wasn't sure as to how many years that meant and I wanted to

5    speak to Mr. Austin in regards to what had happened.  So he spoke to

6    me and he told me, I said how many years is that?  And he said that

7    it was 16 years.  He said, Ms. Tapp, don't worry about anything, he

8    said, because we're going to put an appeal in and I said okay.  And

9    that was it.

10   Q.  Did you later have occasion to overhear a conversation between

11   Ike Spears and your husband?

12   A.  Yes.

13   Q.  And when was that conversation?

14   A.  It was within the week after the sentencing.

15   Q.  And how did that conversation come about?

16   A.  It was a three-way call with my husband Timothy and Mr. Spears.

17   Q.  Was anything said about an appeal during that conversation?

18   A.  Yes.  Timothy asked Mr. Spears if he was going to put the appeal

19   in.

20   Q.  And what did Mr. Spears say?

21   A.  Yes.

22           MS. SCHULBURG:  Nothing further.  Please answer

23   Mr. Landrieu's questions.

24                        CROSS-EXAMINATION

25   BY MR. LANDRIEU:

1    Q.   Ms. Tapp, were you aware that your husband Mr. Timothy Tapp had

2    signed a plea agreement in connection with the case?

3    A.   No, sir.  I don't remember.

4    Q.   You were not involved in any of those aspects of the case,

5    correct?

6    A.   No, sir.

7    Q.   So you didn't know whether or not he had already entered into an

8    agreement with the government that he would agree not to appeal his

9    sentence in connection with this case?

10   A.   No, sir, I didn't know.

11   Q.   Do you know that that is, in fact, true that he did, in fact,

12   enter into that agreement today with the government, even today as

13   you sit here?

14   A.   I am not sure.

15   Q.   Are you aware of that agreement between him and the government?

16   A.   I am not aware of the agreement, no, sir.

17   Q.   You're not aware of that agreement.  Okay.

18         If he had entered into an agreement with the government,

19   he agreed, not his attorneys, but he agreed with the government not

20   to appeal his sentence, what made him change his mind?  If you know

21   any instances.

22         MS. SCHULBURG:  Objection, she can't answer what was in

23   another person's mind.

24         THE COURT:  When there is an objection let me rule on it

25   and you can either answer or we'll get another question.

1          I'll sustain the objection to the extent that it asks this

2    witness what another person was thinking or what another person was

3    aware of.

4              MR. LANDRIEU:  Yes, sir, your Honor.

5              THE COURT:  If you want to rephrase it and question her

6    along that line again I'll allow it.

7    BY MR. LANDRIEU:

8    Q.  You indicated that you spoke to Mr. Austin right as y'all were

9    leaving the courtroom after sentencing, am I correct?

10   A.  Yes.

11   Q.  And at that point in time he indicated that he may file an

12   appeal in connection with the case?

13   A.  Yes.

14             MS. SCHULBURG:  Objection, mischaracterized the testimony.

15             THE COURT:  I am going to sustain the objection.  Go ahead

16   and ask, rephrase your question.

17   BY MR. LANDRIEU:

18   Q.  Did you ask him to file an appeal on behalf of Timothy Tapp or

19   did he voluntarily say we're going to appeal the sentence?

20   A.  Did --

21   Q.  Did you ask him, I want you to file an appeal in connection with

22   this case or Timothy wants you to file an appeal in connection with

23   this case; or did he say, don't worry about it, Ms. Tapp, I'm going

24   to appeal the sentence?

25   A.  I don't remember.

Q.  A little bit earlier when you were under direct examination you

indicated that Mr. Austin said, don't worry about it, Ms. Tapp, I'm

going to file an appeal.

A.  Uh-huh.

Q.  Is that correct?

A.  Yes.  When -- can I talk?  When I spoke to Mr. Austin after the

sentencing, I wasn't able to directly come up and speak to Timothy

because he had already spoken to Mr. Austin, I guess, after he was

sentenced regarding the appeal.  So when I spoke to him I wasn't --

I spoke to him after the sentencing like when we were leaving out,

so I didn't --

        THE COURT:  When you were leaving the courtroom?

        THE WITNESS:  Yes, sir.  But Timothy had already spoken to

him so I am not sure as to, you know, what all Timothy and him

talked about.

        THE COURT:  Okay.  Let me get back to what Mr. Landrieu is

asking you, though, which is the words that were spoken by

Mr. Austin to you on this occasion as you're leaving the courtroom,

do you recall what words were spoken to you by him regarding this

appeal?

        THE WITNESS:  Only thing --

        THE COURT:  What he said?

        THE WITNESS:  Only thing I recall is that he said for me

not to worry about anything, that they were going to put the appeal

in, that's all I can recall.

1          THE COURT:  Okay.  Go ahead.

2          MR. LANDRIEU:  One moment, your Honor.

3   BY MR. LANDRIEU:

4   Q.  Ms. Tapp, do you have any documentation, any letters, any

5   correspondence, any proof of any phone calls, any phone records,

6   anything that can corroborate a story or y'all's version of events

7   that Mr. Tapp either wrote a letter to Mr. Spears or Mr. Austin or

8   that he called Mr. Spears or Mr. Austin asking that they file an

9   appeal in connection with his case within ten days after he was

10  sentenced?  Do y'all have any documentation, any letters, any

11  notations, anything of that nature?

12  A.  No, sir.

13         MR. LANDRIEU:  The government has nothing further.

14         THE COURT:  Any redirect?

15         MS. SCHULBURG:  None, your Honor.

16         THE COURT:  All right.  Thank you, ma'am.  You can step

17  down and you may remain in the courtroom.

18          Next witness.

19         MS. SCHULBURG:  Defendant calls Wilbert Tapp.

20         THE COURT:  Mr. Wilbert Tapp.  Mr. Tapp, if you would come

21  forward, please, sir.  Remain standing until you take the oath.

22  Right up here (INDICATING).

23         THE DEPUTY CLERK:  Please raise your right hand.

24     (WHEREUPON, WILBERT TAPP, WAS SWORN IN AND TESTIFIED AS

25  FOLLOWS:)

```
 1            THE DEPUTY CLERK:  Thank you.  You may be seated.  And
 2   please state and spell your full name for the record.
 3            THE WITNESS:  Name is Wilbert Tapp, W-I-L-B-E-R-T T-A-P-P.
 4                       DIRECT EXAMINATION
 5   BY MS. SCHULBURG:
 6   Q.  Mr. Tapp, what is your relationship with Timothy Tapp?
 7   A.  I'm his father.
 8   Q.  Were you present at his sentencing on June 2001?
 9   A.  Yes, ma'am, I was present.
10   Q.  Did you talk to him that night?
11   A.  Yeah, I talked to him that night.
12   Q.  Was it in person or by telephone?
13   A.  Telephone.
14   Q.  Did he say anything about an appeal in that conversation?
15   A.  Yeah, yeah, he told me he had asked Ron Austin about an appeal.
16   Q.  And that was the night after he was sentenced?
17   A.  Yes, ma'am.
18            MR. LANDRIEU:  Objection to the leading nature of the
19   questions, your Honor.
20            THE COURT:  Let's just ask him direct questions.
21            MS. SCHULBURG:  I have no further questions, your Honor.
22            THE COURT:  Oh, okay.  All right.  Mr. Landrieu.
23                       CROSS-EXAMINATION
24   BY MR. LANDRIEU:
25   Q.  Mr. Tapp, you were present during his sentencing?
```

```
1    A.   Yes, sir.
2    Q.   Were you present when he pled guilty?
3    A.   No, I was not.
4    Q.   You were present when he was sentenced by the court?
5    A.   Yeah.
6    Q.   At any point in time when the court at his sentencing, do you
7    remember Mr. Tapp speaking to the court or telling the court
8    anything concerning his case?
9    A.   No, I don't recall.
10   Q.   You don't remember anything of that nature?
11   A.   It was about eight years ago.
12   Q.   So it's hard to remember that far back?
13   A.   Yeah.
14   Q.   So why do you remember a telephone call that took place later
15   that same evening?
16   A.   Because that's my son and we talk a lot.
17   Q.   Okay.  But your son was just being sentenced in court and I'm
18   assuming you have many conversations throughout your life with your
19   son on the telephone, correct?
20   A.   Oh, yeah.
21   Q.   Nothing unusual about you talking to your son on the telephone,
22   correct?
23   A.   No.
24   Q.   But there is something unusual about your son standing in front
25   of a federal judge, the person with a robe on, discussing his case
```

with him and the judge giving him 194 months in jail, that doesn't

happen very often; in fact, it's only happened once in his lifetime,

am I correct?

A.  Yes.

Q.  Do you think you would remember if your son was discussing

something with the court and what was going on during those

proceedings, that would be a very important proceeding in your son's

life, am I correct?

A.  Correct.

Q.  Do you remember your son talking to the court at all in any

fashion about wanting to appeal his sentence or not being happy with

his attorneys?

A.  Yeah.  I'm trying to think if something was going on in the

court during that day, they was talking something about some kind of

36, 38 or something, I don't know.

Q.  36, 38?

A.  Yeah.

Q.  You don't know what that refers to?

A.  Some kind of guidelines, guidelines or something.

Q.  So you're saying that they mentioned -- was it a level 36 or a

level 38?

A.  I think it was a level 36 and 38 yeah, I think so.

Q.  And they were discussing some numbers about what type of

sentence he was going to get?

A.  Right, yeah.

Q.  At any point in time did your hear your son mention to anybody
while in the courtroom that he wanted to appeal his sentence or that
he wasn't happy with his counsel?

A.  He was telling Ron Austin that he wanted to appeal, that lawyer
that was with him.

Q.  When did you hear that, him tell Mr. Austin that?  Because we
have a transcript of everything that happened in the courtroom and
there is nothing on the transcripts concerning that.

          MS. SCHULBURG:  Objection, that's misleading to the
witness.

          MR. LANDRIEU:  How is that misleading?

          THE COURT:  I don't think it's misleading because we have
a copy of the transcript if the witness would like to see it.  Maybe
that's the better approach we can take.  It's either there or it's
not.  I don't think it's --

          MS. SCHULBURG:  Counsel knows --

          THE COURT:  Ms. Schulburg, would you let me finish,
please.

          MS. SCHULBURG:  I apologize, Judge.

          THE COURT:  I think that it's undisputed that the
transcript doesn't reflect that conversation, so I don't think it's
an inaccurate portrayal.  Perhaps the better thing to do is allow
the witness to review the transcript if he chooses to do so in order
to answer those questions.  So, Mr. Landrieu, if you would let him
take a look at it.

BY MR. LANDRIEU:

Q.  Sir, this is a copy of the transcript of the conversation between the court and your son.

A.  What I'm saying it happened so long ago, I can't recall some of that stuff too much.  I mean, it's been almost eight years, and like I say, I'm 60 years old and my memory is not too good.  I just kind of remember some stuff that was going on in court and you asking me different questions and I'm trying to answer them as best I can. But I can't remember all of that stuff.

Q.  You can't remember all of that?

A.  Yeah.

Q.  It's a long time ago?

A.  Yeah.

Q.  It is a long time ago.

A.  I can't remember all of that stuff.

Q.  You don't think reading this transcript would refresh your memory at all?

A.  It wouldn't do me no good because I can't remember too much of that stuff.

        MR. LANDRIEU:  The government has nothing further, your Honor.

        THE COURT:  All right.  Thank you.  Ms. Schulburg.

                    REDIRECT EXAMINATION

BY MS. SCHULBURG:

Q.  You made reference to your son asking Mr. Austin for an appeal

1     during the courtroom when he was still in court.  Could you explain

2     the extent of your knowledge of that?

3     A.  Yeah.

4     Q.  Please go ahead and tell the court about that.

5     A.  Yeah.  When they had sentenced him he kind of like was kind of

6     dejected and he looked at Ron Austin and he told Ron Austin that he

7     wanted to appeal.

8     Q.  Did you actually hear that?

9     A.  No, I just read it, like I read his lips.  I didn't hear him

10     because I was sitting in the back.  I was just like read the lips

11     because he was kind of dejected and he was saying I want to appeal.

12           MS. SCHULBURG:  Nothing further.

13           THE COURT:  You were sitting in the back of the courtroom

14     just like this on the fourth floor?

15           THE WITNESS:  Yes.

16           THE COURT:  And you were sitting in the back of the

17     courtroom?

18           THE WITNESS:  Yeah, because I was looking at him because

19     he was kind of dejected after.

20           THE COURT:  And you could read his lips?  He was standing

21     up here by the podium, wasn't he, with his lawyer?

22           THE WITNESS:  Yeah.  It was a whole bunch of them, Tim and

23     some more other people.  It was about -- he had got sentenced it was

24     about three or four other defendants that was up there and some more

25     lawyers, other lawyers.

1      THE COURT:  Well, you couldn't hear him saying things --

2      THE WITNESS:  That's true.

3      THE COURT:  -- is that correct?

4      THE WITNESS:  Just read his lips.

5      THE COURT:  Because if he had said something out loud it

6 probably would have been on the transcript of what the court

7 reporter takes down.  Okay.  So you didn't hear anything audibly but

8 you could read his lips.  Tell me what he said based upon your

9 reading of his lips.

10      THE WITNESS:  He was telling Ron Austin I want to appeal.

11      THE COURT:  Did he say anything else?

12      THE WITNESS:  No.  He was kind of sad, he didn't say

13 nothing too much more than that.  He just had his head down.

14      THE COURT:  I'm curious.  Have you, I mean, are you -- and

15 I'm asking seriously.  Do you read lips as a hobby?  You're capable

16 of discerning or is it just something based upon the fact that this

17 is your son?

18      THE WITNESS:  It was based on -- I was more concerned

19 about him and I was just looking at him and I just read his lips

20 telling Ron Austin that because I was concerned, he was dejected and

21 he was kind of like sad.

22      THE COURT:  Okay.

23      MS. SCHULBURG:  May I ask just to follow-up?

24      THE COURT:  I am going to let him recross if you ask

25 anything else.  Redirect is over.  I'll let you do it since I asked

1    questions, I'll let you follow-up.  But if we're going to take

2    another pass at this witness, it's fair enough because I've asked

3    questions, but I think the door should be open to both of you.

4              MS. SCHULBURG:  No, your Honor, that's fine.

5              THE COURT:  Okay.  Thank you, sir.  That's fine.

6    Anybody else for the defendant at this time?

7              MS. SCHULBURG:  No, your Honor.

8              MR. LANDRIEU:  The government has no witnesses, your

9    Honor.

10             THE COURT:  I will allow each of you to go ahead and make

11   brief argument based on the evidence that we've heard here today and

12   the opinion obtained from the Fifth Circuit.

13             MR. LANDRIEU:  Your Honor, can we have 30 seconds so I can

14   let Mr. Spears go, I think he is in the hallway, since he was called

15   as a witness.

16             THE COURT:  Sure.  Go ahead.

17             MR. LANDRIEU:  I'm ready to proceed, your Honor, I'm

18   sorry.

19             THE COURT:  Go ahead, Ms. Schulburg.

20             MS. SCHULBURG:  Your Honor, we've presented three people

21   who say they either -- Mr. Tapp has said he asked Mr. Austin for an

22   appeal and he had a conversation in which Ike Spears a few days

23   later told him that there would be an appeal.  His wife confirmed

24   that latter conversation and also said Ron Austin told him there

25   would be an appeal.  And Mr. Tapp, setting aside his ability to read

1    lips, said his son made a prior consistent statement the night of

2    the sentencing that he had asked for an appeal.  There was a lot of

3    consternation about the sentence.

4         Mr. Landrieu has said why isn't that request on the

5    transcript, why didn't you tell the judge?  I do appeals, your

6    Honor, I've never seen in federal court a defendant tell the judge

7    during sentencing they want an appeal.  A defendant's conversations

8    with his lawyer and his request to appeal would not be on the

9    transcript, it would be private.

10        Mr. Spears did file a notice of appeal, it was one day

11   late.  That to me, independent of testimony, says that his client

12   asked him to file a notice of appeal.  The only way that that does

13   not, could possibly not prove that Mr. Tapp timely asked for an

14   appeal is if he asked for that appeal one day late.

15        Even if that had happened, Mr. Spears could have under

16   Rule 4 asked for an extension of time because it was within the 30

17   day period and explained why he was late.  And, in fact, the Fifth

18   Circuit remanded and asked him to do that and he did not file a

19   brief.

20        So I think the notice of appeal that was filed, in fact,

21   is enough to prove our case independent of what the witnesses have

22   testified to.  So we would ask that you grant Mr. Tapp an

23   opportunity to --

24        One other thing, your Honor.  On this question of the

25   appeal waiver.  The appeal waiver, as I understand it, did not waive

the right to appeal conviction and there are issues that it does not

cover, and in fact, that's probably why the Fifth Circuit made the

ruling it did and wants an attorney to take a look at the record, if

the defendant desires an appeal and make that assessment.  Thank

you.

THE COURT:  All right.  Thank you.  Mr. Landrieu.

MR. LANDRIEU:  Your Honor, under the very specific reasons

why we're here, the Fifth Circuit in the case, we should have this

hearing to see if the petitioner is able to demonstrate by a

preponderance of the evidence that he requested an appeal.  That's

it.  It's just a preponderance of the evidence, I understand their

burden is very low.

The simple fact of the matter is they didn't even meet

that burden today.  If you start off with the testimony of

Mr. Wilbert Tapp, with all due respect, he indicated he did not

really understand or did not really remember what was going on that

long ago.  He seems to have some type of memory specifically about

this one very small conversation where he was reading lips, but

remembers nothing else of the rest of the day.  And can't really get

into any details as to what was going on.  And again it was a long

time ago.  I don't fault him.  But it appears that his memory has

more to do with trying to help his son than it is with the true

facts of what's going on and his preparation of this case.

Second, Ms. Kenyatta Tapp, her testimony was that

Mr. Austin made some reference to filing an appeal.  That is not

1   what the Fifth Circuit indicated whether the attorney wanted -- said

2   he was going to fill an appeal, but whether this defendant asked his

3   attorney to file an appeal.  So her testimony really doesn't help us

4   out in the least bit.

5          The only testimony that we have that indicates that the

6   defendant asked his attorney to file an appeal is Mr. Tapp's.  And

7   it comes down to a question of credibility, and unfortunately the

8   Fifth Circuit put us in this position to where we are in a circular

9   argument now.  This court has already looked at multiple claims by

10  this defendant and have found them to be untrue and false.  He has

11  no credibility at this point in time with the court.

12         And nothing in the record, there is not one single piece

13  of evidence that was filed into this record, not a letter from the

14  defendant, not phone records, not any statements by his own

15  attorney.  Nothing that indicates that he asked his attorneys to

16  file an appeal.  The exact opposite, in fact, is evident in the

17  record.  There is a copy of a plea agreement where the defendant

18  signed, under oath, admitting that he agreed with all of the

19  elements of the plea agreement where he waived his right to appeal.

20  Exact contradictory to what he is saying now.

21         There is a transcript of his re-arraignment where he says

22  he is satisfied with his attorney's performance.  There is a

23  transcript of his sentencing hearing where he does not mention once

24  about his desire not to go forward with his plea, not to go forward

25  with his sentencing.  In fact, if the court reads his sentencing

1    transcript, the court specifically asked him, is it okay for

2    Mr. Austin to represent you here today, are you satisfied with that?

3    And he says, yes, I'd like this attorney to continue to represent

4    me, I know he is a member of Ike Spears' firm, that's okay with me.

5    There is nothing even at that point in time that indicates that he

6    is unhappy with his attorney's performance or that he is unhappy

7    with the plea.

8            So the record I think is overwhelmed with the evidence or

9    circumstantial evidence to show that he never intended to appeal or

10   wanted to appeal.  It's only now with a last stitch effort to try to

11   save some face and have some type of appeal that they come up with

12   this story, and I think it just comes down to a question of

13   credibility and in connection with this case I believe they lose.

14           MR. LANDRIEU:  Thank you.

15           THE COURT:  Thank you, Mr. Landrieu.  The court has before

16   it a 2255 of the defendant Timothy Tapp.  As I indicated at the

17   outset, the Fifth Circuit, and I'll quote here from the opinion of

18   what the court's task is before it today.  "The court is directed to

19   hold an evidentiary hearing to determine simply whether Tapp

20   requested that his counsel file an appeal."  The court citing the

21   Flores Ortega opinion, which is from the court follows the Flores

22   Ortega opinion which is a 2000 case from the Supreme Court, and

23   directs the court to consider the preponderance of the evidence that

24   the defendant requested an appeal and that the court cannot presume

25   prejudice -- rather prejudice would be presumed and so, therefore,

1    the court would consider whether or not the defendant was entitled

2    to an out of time appeal.

3        Turning to the evidence that's presented to the court at

4    this time.  We have the testimony of Timothy Tapp himself.  As the

5    government has pointed out, Mr. Tapp said under oath in court a

6    variety of things in relation to his plea and at the time of

7    sentencing in addition to the documentary evidence that was

8    submitted in connection with the plea, which the court took at face

9    value in its prior ruling with regard to this 2255.  Quite frankly,

10   at that juncture I felt as though Mr. Tapp's statements on the

11   record under oath, and in the documentation which he signed after

12   the court examined him under oath in open court, would be

13   dispositive of this issue.

14       Mr. Tapp today indicates things that are not consistent

15   with the prior record, which he made, and the court is troubled by

16   those representations.  But perhaps those troublesome issues would

17   be handled on another day.  His testimony today is that he did

18   request an appeal, both in court directly to his attorney following

19   sentencing, as well as in a telephone call some days later.  The

20   court simply cannot place a lot of weight on his testimony given the

21   previous inconsistent statements that he has made.  Now inconsistent

22   statements with what he has said before.

23       Now, the court also had the testimony of Wilbert Tapp,

24   whose memory was not particularly good.  He references an incident

25   in court at the time of sentencing where he claims to have been able

1    to discern through lip reading that his son, the defendant sought an

2    appeal and mentioned that to the attorney while they were standing

3    in the podium area of the courtroom.  He also references a telephone

4    call that he had with Mr. Tapp later that evening wherein Mr. Tapp

5    was under the impression that an appeal would be taken.

6           Mr. Tapp's testimony also cannot carry too much weight,

7    given the fact that he himself says that his recollection is not

8    that good given the length of time that has passed since the event

9    of the sentencing and today.

10          The third witness, however, Kenyatta Tapp testified to a

11   couple of instances.  First, that she spoke directly to Mr. Austin

12   who was the attorney in lieu of Mr. Spears who appeared with

13   Mr. Tapp on the date of sentencing, that she spoke with him

14   immediately after sentencing as they were exiting the courtroom,

15   wherein Mr. Austin indicated that an appeal would be taken.  She was

16   not entirely clear on the exact wording of it, but the

17   representation was made that an appeal would be taken.

18          She also was a party to a three-way telephone conference,

19   which Mr. Tapp testified to.  However, his testimony standing alone

20   the court would not accept, but Ms. Tapp's testimony indicated that

21   she was a party to that conversation with Mr. Spears at that time

22   who indicated that an appeal would be taken.  And, of course, as

23   evidenced in the record an appeal, a notice of appeal was filed one

24   day out of time, which would appear to be consistent and

25   corroborative with the conversation regarding the intent to take an

1    appeal or an instruction to take an appeal.

2           Given that, the court will find by a preponderance of the

3    evidence, which is as Mr. Landrieu indicated, the lowest of

4    evidentiary burdens to have to meet, that the defendant did request

5    an appeal and so the court will allow the defendant to take an out

6    of time appeal to the Fifth Circuit.

7           I believe that's all that has been placed before the court

8    by virtue of a Fifth Circuit opinion, and in so ruling the court

9    makes no representation, and, in fact, the Fifth Circuit opinion

10   specifically indicates that the court should not take into

11   consideration the merits of any such appeal.  So the court refrains

12   from doing so at this time and nothing that the court has said today

13   will in any way comment on the merits or lack thereof of any appeal

14   that Mr. Tapp will take at this time.  All right.

15          MS. SCHULBURG:  Brief question, your Honor.  Mr. Tapp is

16   going to need appointment of counsel.  Can you refer this to the

17   magistrate or shall we file a motion?

18          THE COURT:  I'll go ahead and refer it to the magistrate

19   at this time.

20          MS. SCHULBURG:  Thank you.

21          THE COURT:  He had a notice of appeal pending.  That has

22   already been rejected by the court of appeal, so you will have to go

23   ahead and file one until he is appointed counsel on the appeal.

24          MS. SCHULBURG:  Okay.  Thank you, your Honor.

25          MR. LANDRIEU:  Thank you, Judge.

1          THE COURT:   Thank you all.

2          (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

3

4                        * * * * * *

5

6                   REPORTER'S CERTIFICATE

7

8     I, Karen A. Ibos, CCR, Official Court Reporter, United States

9 District Court, Eastern District of Louisiana, do hereby certify

10 that the foregoing is a true and correct transcript, to the best of

11 my ability and understanding, from the record of the proceedings in

12 the above-entitled and numbered matter.

13

14

15                       _____

16                       Karen A. Ibos, CCR, RPR, CRR

17                       Official Court Reporter

18

19

20

21

22

23

24

25